UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

LaVON COX,

                       Petitioner,                       **DECISION AND ORDER**
                                                          No. 02-CV-0411

     -vs-

VICTOR HERBERT, Superintendent Attica
Correctional Facility,

                       Respondent.
_____

## INTRODUCTION

Petitioner, LaVon Cox ("Cox"), filed this *pro se* petition for a writ of habeas corpus

pursuant to 28 U.S.C. § 2254 challenging his conviction in Niagara County Court of four counts

of assault in the first degree, one count of assault in the second degree, two counts of criminal

use of a firearm in the second degree and one count of criminal possession of a weapon in the

second degree. The parties have consented to disposition of this matter by the undersigned

pursuant to 28 U.S.C. § 636(c).

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Shawn Matthews, supervisor at the 3Ms, a bar in the City of Niagara Falls, testified that

on December 31, 1996, he broke up a fight there involving several men. One of them was Cox,

whom Matthews knew as "Tobori." T.42-43.[1] Upon Matthews's request, Cox left the bar

voluntarily; several of the other men involved in the altercation had to be forcibly removed. One

of the men asked to leave, whom Matthews knew as "Jabar," threw a bottle through the front

_____

[1] Citations to "T.__" refer to the trial transcript.

window of the bar, causing chaos inside. T.50. Matthews then saw Cox coming back into the bar; Matthews tried to stop him, but Cox continued past him toward the back area of the bar. T.52, 54. Matthews noticed that Cox was holding a gun in his right hand, behind his back. T.52, 54. Matthews saw Cox raise the gun over his head and fire into the ceiling once; Cox then lowered his hand and started firing in the direction of the crowd. T.55-56. During the melee, Matthews heard eight or nine gun shots fired. T.58.

Ashanti Jones ("Jones") testified that at about 2:30 a.m. on the night of December 31, 1996, she was at the 3Ms with her cousin Aisha Stancil ("Stancil"). They were in the back room of the bar dancing to the dee-jay.  Jones saw a man she knew as Tobori come into the back room holding a medium-sized silver handgun. T.114-15, 119. Jones saw the flash from the muzzle and said that he fired the gun "a lot" of times. T.116-17. While Cox was still shooting, Jones and Stancil started to run, but apparently Stancil had been shot and dropped to the ground. Jones testified that hundreds of people were packed in together in the back room into which Cox was shooting. T.120. Jones admitted on cross-examination that when Cox was firing the gun, he was pointing it down towards the ground, and was not shooting the gun at chest-level towards people. T.143.

Stancil testified that she saw the person she knew as Tobori shooting a silver-colored handgun towards where everybody was standing or dancing in the back room. T.223-24. Stancil recalled that "everybody was like on the floor trying to get away from him and he was aiming towards the crowd" of people down on the floor. T.224-26. Stancil began to run away but her legs gave out because she had been shot in the left shin. T.228. Stancil testified that nobody was standing near Cox while he was shooting, and he was not fighting or wrestling with anyone for

control of the gun. T.229. Stancil stated that the doctors were unable to remove the bullet which remained lodged in her bone. T.232. On cross-examination, Stancil testified that she knew what she saw and that she saw Cox shoot her. T.238.

Naki Dante Marvin ("Marvin"), Stancil's boyfriend, testified that he was dancing in the back room with Stancil when a person he knew as Tobori (Cox) came into the club and said, "[W]here those mother fuckers at," and "pointed the handgun" and "just started shooting." T.500. Marvin described the gun as a "big," "silver" 9-mm handgun. T.502. Marvin grabbed Stancil and started running out of the bar.

Stephanie Flynn ("Flynn") testified that she was at the 3Ms when she heard something that sounded like "firecrackers" and started to run. On her way out, Flynn fell and hit a table. She did not realize that she had been shot in the leg until she got outside and was unable to bend her leg to get into the car. At the hospital, the doctors removed a bullet from her leg.

On the night of the incident, Erica Rivers ("Rivers") drove to the 3Ms in a white car with several individuals, including Cox and his uncle, Michael Cox. T.282-83. She was talking to Latosha Bryant in the back room when she heard gunshots. T.284-85. Rivers ducked and tried to get out through the side door. T.285. However, Rivers had been hit with a bullet in her lower right leg and collapsed. T.286-87.  Rivers had three surgeries, including a skin graft procedure to fill in the hole left by the bullet wound. T.290-92. Rivers did not see who was doing the shooting and stated that she did not remember seeing Cox in the back room at the club that night. T.305.

Latosha Bryant ("Bryant") testified that she was at the 3Ms on the night of the incident sometime after 2 a.m. when she heard a gunshot. T.324. Bryant said that she did not run because there was nowhere to go due to how crowded it was. *Id.* She testified that she got shot in the left

leg and fell to the ground, where she saw Cox pointing the gun and shooting at Antwan Giles ("Giles"). T.325, 327, 328. Giles was "balled up" on the ground in a "fetus position." T.326. Bryant recalled hearing from five to eight shots. T.328. Bryant estimated that Cox was standing about six to eight feet from Giles during the shooting. T.330. Bryant testified that, while at the 3Ms, she had heard about an earlier altercation in the bar, but she did not witness it. T.337.

Antwan Giles ("Giles") testified that he went to the 3Ms on January 31, 1996, arriving at about 12:45 a.m. Shortly after he got there, he saw his friend, Jabar Ellis, arguing with Michael Cox. T.361-62. Giles pulled Jabar away and took him out to the bar to cool off; Jabar ened up leaving to go home. T.362. Giles testified that Michael Cox approached him and told him to "stay out of it." T.363. Giles recalled that Cox "stepped up" when Michael Cox and Jabar were arguing. T.363. Giles told Cox that he (Giles) did not have anything to do with their argument and that he (Cox) should take his uncle (Michael Cox) home. T.365. Giles left the area and went back to the bar.

A little while later, Giles testified, he was in the back room when he heard gunshots and turned around. T.366, 369. He saw Cox with a chrome gun pointing towards him. T.369. Giles was "in shock" and threw his hands up in the air as Cox started shooting at him. T.369-70. Giles tried to run, but he was hit in his left thigh; he spun around and got shot again, which caused him to fall to the ground. T.371. Giles testified that there was nobody near Cox while Cox was shooting the gun. T.375-76. On cross-examination, Giles stated that Cox had an "attention zone looking for the people" and was "probably looking for [him]." T.397.

Camecia Walker ("Walker") was sitting in a car outside of the 3M Club on the night of the incident and had witnessed the earlier altercation involving Giles, Jabar, Michael Cox, and

Cox. T.483-87. She later observed Cox, whom she knew from the neighborhood, exit the bar and remove a silver-colored object, which she believed to be a gun, from the trunk of a white car. T.493-94. Walker heard a series of four or more shots and then people started exiting the bar; she saw Cox leave the bar after the gun shots had stopped. T.497.

The defense called Nicole Isom ("Isom"), an acquaintance of Cox's. She testified that she witnessed the earlier altercation at the 3Ms in which Michael Cox got struck on the head with a bottle. T.525. During the fight, as Cox was reaching down to help his uncle, Michael Cox, get up, Mark Florence ("Florence"), a cousin of Giles's, "pulled up his shirt" and "flashed" a gun. T.526. Florence said, "I'll shoot you," to Cox and Michael Cox. T.540-43.Then the fight was broken up. Isom testified that very soon thereafter, she heard "a bang, a boom," and she "just ran out." T.530. She did not see who had fired the gun. *Id.*

Michael Cox, Cox's uncle, testified for the defense. He described himself as a crack addict with a long history of felony convictions–mainly for assaults and robberies. Michael Cox testified that on the night of December 31, 1996, he purchased some crack cocaine from Giles for $20. T.601-02. However, he was unhappy with the amount that he received for his money and complained to Giles about it. T.602. Michael Cox testified that Giles "got a couple [of] his friends around" and they all "started arguing" and "struggling [and] wrestling," and someone hit him in the back of the head with a bottle. T.602. According to Michael Cox, he heard gunshots while his nephew, Cox, was helping him up off the floor. T.614-15.

Officers John Chella ("Chella") and Patrick Stack ("Stack") testified that in December 1996 he became involved in an unrelated criminal investigation regarding weapons trafficking by Bobby Cox, who happened to be petitioner's uncle. T.307. On January 20, 1997, the two officers

went to the home of Bobby Cox with a warrant to search for six specific weapons. They found

three guns in the trunk of a 1979 Buick registered to Bobby Cox. T.308-09.  Two of the guns

found happened to be 9-mm semiautomatic pistols; one was a Remington Hi-Point and one was

Keltec. T.309.

The ballistics expert testified at trial regarding the four projectiles and eight 9-mm shell

casings recovered from the crime scene and the victims. T.408.  He stated that six of the eight

casings were fired from the assault weapon (a Remington Hi-Point 9-mm handgun) found in the

trunk of Bobby Cox's car and introduced into evidence at trial as People's Exhibit 2. T.424-25.

The expert testified that the Remington Hi-Point fired the two projectiles found in the back area

of the bar, where people were dancing to the dee-jay. The expert also stated that the Remington

Hi-Point was used to fire the bullets that were removed from Flynn and Rivers. T.426.  In

addition, there were two casings found in the front part of the bar which did not match People's

Exhibit 2, the Remington Hi-Point. However, there was no testimony presented that a shooting

had occurred in the front part of the bar on that New Year's Eve.

The police testified that Cox turned himself in on January 5, 1997. T.163-68. Cox agreed

to waive his rights, and he gave a written statement admitting being at the 3Ms on the night of

the incident and being involved in a fight. However, he denied any involvement in the shooting.[2]

---

[2] "On 1-1-97 I went to the 3M's bar . . . . I came with friends. I was there for about two or three hours drinking beer. I wasn't drinking a lot, my uncle was drunk. (Michael Cox) He asked me to take him home. I said I would and left him inside and went out the bar to try and get him a ride. I went back in and he was in a fight. While he was fighting, I came into the back room to help him, I grabbed an unknown black male and he had something in his hands. He shot it and then I knew it was a gun. The gun went off about four or five times. The gun dropped and I ran out the front door and he ran out the back door. The police were in front when I ran out. I didn't have a gun and I didn't own a gun. When I ran out front, I heard more shots. I then got into a car with Lisa Thomas, from Canada, and we drove to a motel . . . . I came in on 1-5-97 and turned myself in and gave this statement to Detective Conte. I do not want to say anything else." T.174.

The jury returned a verdict convicting Cox of four counts of assault in the first degree (N.Y. Penal Law § 120.10(3)) with respect to Giles, Stancil, Bryant and Rivers. He was convicted of one count of assault in the second degree (N.Y. Penal Law § 120.05(2)) with respect to Flynn. Finally, Cox was convicted of two counts of criminal use of a firearm in the first degree (N.Y. Penal Law § 265.09) and one count of criminal possession of a weapon in the second degree (N.Y. Penal Law § 265.03). He was acquitted of the two counts of second degree burglary charged in the indictment. Cox was sentenced to seventeen and one-half to twenty-five years on the four counts of first degree assault, three and one-half to seven years on the count of second degree assault, twelve and one-half to twenty-five years on the two counts of first degree criminal use of a firearm, and seven and one-half to fifteen years one the count of second degree criminal possession of a weapon. All sentences were set to run consecutively to each other.

Represented by new counsel, Cox appealed his conviction to the Appellate Division, Fourth Department, of New York State Supreme Court. He raised the following arguments: (1) prosecutorial misconduct on summation; (2) improper cross-examination by the prosecutor; and (3) harsh, excessive and vindictive sentence. The Fourth Department affirmed the conviction but modified petitioner's sentence on the law, holding that the sentences on the two counts of criminal use of a firearm in the first degree and one count of criminal possession of a weapon in the second degree run concurrently with the sentences imposed on their related assault counts. *People v. Cox*, 256 A.D.2d 1244, 684 N.Y.S.2d 366 (App. Div. 4th Dept. 1998) (citing, *inter alia*, N.Y. Penal Law § 70.25(2)). The New York Court of Appeals denied leave to appeal. *People v. Cox*, 93 N.Y.2d 923, 715 N.E.2d 509, 693 N.Y.S.2d 506 (N.Y. 1999).

On February 26, 1999, Cox filed a *pro se* motion to vacate the judgment pursuant to New

York Criminal Procedure Law ("C.P.L.") § 440.10 in the trial court. He asserted the following

claims: (1) evidence was adduced by the prosecution that was knowingly false; (2) *Rosario*[3]

material was withheld from the defense; (3) newly discovered evidence; (4) *Brady*[4] material was

withheld form the defense; and (5) defendant was denied the effective assistance of trial counsel.

The prosecutor argued that the motion must be denied because all of the issues raised therein

were apparent on the record and could have been raised on direct appeal. *See* N.Y. Crim. Proc.

Law § 440.10(2)(c). The trial court first considered the substance of petitioner's claims and

found them without merit. As to the false evidence claim, the court held that Cox "failed to make

any showing . . . that there was any evidence adduced by the prosecution or the court at the trial

which they knew to be false[.]" April 13, 1999 County Court Order at 4[5] (citing N.Y. Crim. Proc.

Law § 440.10(1)(c)).  With respect to the *Rosario* and the *Brady* claims, the court held that

petitioner's allegations were "unsupported by the record, and specifically disproved by the very

documents submitted by [him] in 'support' of the 440 motion, which submissions clearly indicate

that the information had been supplied by the prosecution and was known to the defense." *Id.* at

5, 6 (citations omitted). As to the claim of newly discovered evidence, the court found that

contrary to petitioner's assertion, there "was no showing . . . of any newly discovered evidence in

this case at all." *Id.* at 5. Finally, the court dismissed the ineffective assistance claim, which was

"based primarily on counsel's failure to utilize purported impeachment material that was . . .

undisputedly in counsel's possession." *Id.* at 6. The court stated that petitioner's argument

---

[3]     *People v. Rosario*, 9 N.Y.2d 286, 290 (1961).

[4]     *Brady v. Maryland*, 373 U.S. 83 (1963).

[5]     Copies of petitioner's three C.P.L. § 440.10 motions are attached to his Amended Petition (Docket #21).

"raise[d] no issue that could not be resolved on the trial court and which could, and should, have been raised on direct appeal." *Id.*  The court went on to note that because all of petitioner's arguments were "adequately disclosed in the record[,]" C.P.L. § 440.10(2)(c) "require[d] that this Court deny the motion." *Id.* at 6-7.

Cox filed a second C.P.L. § 440.10 motion raising substantially the same issues as raised on the first motion. The trial court denied the motion in its entirety, holding that the issues raised therein could have been raised previously by Cox through the exercise of due diligence, but had not been. *See* June 28, 2001 County Court Order; *see also* N.Y. Crim. Proc. Law § 440.10(3)(a), (c).

Cox also filed two applications for a writ of error *coram nobis* in the Appellate Division. These motions were summarily denied on November 13, 2000 (*People v. Cox*, 277 A.D.2d 1062, 716 N.Y.S.2d 349 (App. Div. 4th Dept. 2000)), and June 7, 2002 (*People v. Cox*, 743 N.Y.S.2d 770 (App. Div. 4th Dept. 2002)). The New York Court of Appeals denied leave to appeal on January 16, 2003. *People v. Cox*, 99 N.Y.2d 581, 785 N.E.2d 739, 755 N.Y.S.2d 717 (N.Y. 2003).

On June 5, 2002, Cox filed his initial petition for federal habeas relief. *See* Docket #1. Cox sought and was granted several motions to hold the petition in abeyance so that he could return to state court and exhaust various claims. *See* Docket ## 11, 12, 19, 27, 28. Pursuant to this Court's order, Cox filed an amended petition on January 7, 2005, in which he raises the following grounds for relief: (1) the prosecutor committed misconduct on summation; (2) the prosecutor's cross-examination of a witness was improper; (3) the sentence was harsh and excessive, and also vindictive; (4) "falsified and tampered with evidence [was] used to obtain

indictment and conviction"; (5) trial counsel was ineffective; (6) appellate counsel was ineffective; (7) the prosecution failed to establish petitioner's guilt beyond a reasonable doubt; and (8) the prosecutor "submitted false evidence by permitting Ms. Bryant to testify to removal of projectile where prosecutor knew that this evidence was false." Docket #21. Petitioner states that ground four is unexhausted. *Id.*

Respondent answered the amended petition on and submitted the exact same cursory memorandum of law that it did in opposition to petitioner's first petition. Respondent, in a remarkable lack of concern for his case, completely fails to acknowledge that petitioner has raised four additional grounds for relief and addresses only these issues: (1) the prosecution failed to turn over *Brady* material; (2) trial counsel was ineffective; (3) appellate counsel was ineffective; and (4) the prosecution failed to prove petitioner's guilt beyond a reasonable doubt. *See* Docket #23. The Court is at a loss as to why respondent failed to address the remaining four claims asserted in the Amended Petition and failed to take a position regarding the claim that petitioner asserts remains unexhausted. In its Answer to the Amended Petition, respondent takes the position that all of Cox's claims are exhausted, effectively stipulating that all of Cox's claims are exhausted, thereby waiving the defense of non-exhaustion.  Accordingly, the Court will treat them as such.  Respondent did argue, however, that the ineffective assistance of trial counsel claim is subject to a procedural default due to the trial court's dismissal of the claim pursuant to C.P.L. § 440.10(2)(c). However, because it is more efficient to dispose Cox's ineffective assistance of counsel claim on the merits, in the interest of judicial economy the Court will resolve the claim substantively. Having failed to argue that any of petitioner's other claims are procedurally defaulted, respondent has waived the affirmative defense of procedural default as to

the remaining claims. For the reasons set forth below, none of petitioner's claims warrant habeas relief, and the petition is dismissed.

**DISCUSSION**

<u>Standard of Review</u>

To prevail under 28 U.S.C. § 2254, as amended by the Anti-Terrorism and Effective Death Penalty Act ("AEDPA") in 1996, a petitioner seeking federal review of his conviction must demonstrate that the state court's adjudication of his federal constitutional claim resulted in a decision that was contrary to or involved an unreasonable application of clearly established Supreme Court precedent, or resulted in a decision that was based on an unreasonable factual determination in light of the evidence presented in state court.  *See* 28 U.S.C. § 2254(d)(1), (2); *Williams v. Taylor*, 529 U.S. 362, 375-76 (2000).

<u>Merits of the Petition</u>

1.      **Prosecutorial misconduct on summation**

Cox contends that the prosecutor made numerous improper remarks which were intended to denigrate defendant, defense witnesses, and defense counsel; to bolster the prosecution's witnesses; to diminish the prosecution's burden of proof; and to appeal to the jurors' fears and sympathies. In addition, Cox argues, the prosecution put forth a theory of the case inconsistent with the proof with respect to victim Stephanie Flynn, whom the prosecutor argued was hit by a "bouncing bullet."

On direct appeal, the Appellate Division found that Cox only "objected to one alleged instance of misconduct when the prosecutor suggested to the jury that it could infer that one victim was injured by a bullet that ricocheted." *People v. Cox*, 256 A.D.2d at 1244. The court

found that the comment "was not improper." *Id.* Because Cox did not object to the remaining alleged instances of misconduct, the court held that he failed to preserve those instances for review. *Id.* (citing N.Y. Crim. Proc. Law § 470.05(2)). In any event, the court found, "although some of the comments made by the prosecutor improperly appealed to the jury's sympathies and fears, . . . they were not so egregious that they denied defendant a fair trial[.]" *Id.* (citation omitted).

The habeas court's scope of review as to claims of prosecutorial misconduct is quite limited. In order to overturn a conviction, the Court would have to find that the prosecutor's comments constituted more than mere trial error and instead were so egregious as to violate the petitioner's due process rights. *See Donnelly v. DeChristoforo*, 416 U.S. 637, 647-48, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974); *Floyd v. Meachum*, 907 F.2d 347, 353 (2d Cir.1990) ( "The appropriate standard of review for a claim of prosecutorial misconduct on a writ of habeas corpus is the narrow one of due process, and not the broad exercise of supervisory power.") (internal quotation marks and citations omitted); *accord Tankleff v. Senkowski*, 135 F.3d 235, 252 (2d Cir.1998).

Thus, to be entitled to relief, Cox must show that he "'suffered actual prejudice because the prosecutor's comments during summation had a substantial and injurious effect or influence in determining the jury's verdict.'" *Tankleff*, 135 F.3d at 252 (quoting *Bentley v. Scully*, 41 F.3d 818, 823 (2d Cir.1994) (internal quotation marks and citation omitted in original))."Rarely are comments in a prosecutor's summation 'so prejudicial that a new trial is required.'" *United States v. Germosen*, 139 F.3d 120, 128 (2d Cir.1998) (quoting *United States v. Forlorma*, 94 F.3d 91, 93 (2d Cir.1996) (quotations omitted)), *cert. denied*, 525 U.S. 1083 (1999). Reversal of a

defendant's conviction is warranted only where "'the statements, viewed against the entire argument before the jury, deprived the defendant of a fair trial.'" *Id.* (quoting *Forlorma*, 94 F.3d at 94) (quotations omitted). In determining whether a defendant has suffered actual prejudice as a result of the prosecutorial misconduct, the reviewing court considers "'the severity of the misconduct; the measures adopted to cure the misconduct; and the certainty of conviction absent the improper statements.'" *Floyd*, 907 F.2d at 355 (quoting *United States v. Modica*, 663 F.2d 1173, 1181 (2d Cir.1981) (*per curiam*)); *accord*, *e.g.*, *Germosen*, 139 F.3d at 128; *United States v. Miller*, 116 F.3d 641, 683 (2d Cir.1997). Moreover, where the defendant did not object to the remarks at trial, reversal is warranted only where the remarks "were so substantially prejudicial as to constitute 'flagrant abuse.'" *United States v. Russo*, 302 F.3d 37, 47 (2d Cir. 2002) (quoting *Germosen*, 139 F.3d at 128). The Court first will review all of the challenged remarks and then discuss whether their cumulative effect was sufficient to deny Cox his right to a fundamentally fair trial.

        The following comments, according to Cox, improperly injected the prosecution's personal beliefs about the strength of its case into the trial. First, the prosecutor commented, "I've been involved with this case for quite some time." T.655. Later, he asked, "Do you think he was trying to kill him? Hell no. No. He wasn't indicted for attempted murder. Nobody believes he was trying to kill him." T.675. The prosecutor also made the following remarks:

> I'm sorry if I get worked up, but you know, like I said, I don't know what you folks are thinking. I like to think that you're with me on this. And then, you know, when I finish, I get to this point, I lay awake at night and say to myself, how can they not see it this way? They've got to, they've got to. They're intelligent people.

T.691.

How in the world can you conclude anything else but that this defendant walked into that back room with a gun and shot all those people? How in the hell can you come up with any other conclusion? Any twelve people can see what happened. When we selected this jury and the judge said who do you want to get rid of, I said they're all acceptable, they're all acceptable, they're all acceptable, because you answered the questions and you said you could do it and I put my trust in you and my faith in you to do your job. Don't fall short on me now.

T.699.  Both prosecutors and defense counsel must refrain from injecting personal beliefs into the summation. *United States v. Young*, 470 U.S. 1, 13 (1984). Although counsel are entitled to broad latitude in summation, they may not misstate evidence, refer to facts not in evidence, or express their own personal beliefs as to guilt or innocence. *United States v. Smith*, 778 F.2d 925, 929 (2d Cir. 1985) (citing *United States v. Suarez*, 588 F.2d 352, 354 (2d Cir. 1978)). Here, the prosecutor reminded the jurors that he had done them a favor by putting faith and trust in them, implying that since he counted on them, they should not let him down–that he was deserving of payback because he had trusted them by not challenging them,, and that they owed him and should reward him by finding Cox guilty–a sort of *quid pro quo*. This was plainly improper. Compounding the prosecutor's  inappropriate conduct was his resort to profanity, his emotional turmoil from his self-proclaimed conscience causing him loss of sleep to emphasize his emotional commitment to a finding of guilt, and his pandering to the jury's "intelligen[ce]," T699,  to cow them into finding Cox guilty so that they would not be considered stupid. The prosecutor did not directly say that he believed that Cox was guilty; his comments were somewhat more oblique. However, they were obviously designed to interject his personal beliefs about the strength of his case, and, by implication, Cox's guilt. The Court also finds that it was wholly inappropriate for the prosecutor to equate the jurors' civic duty with returning a guilty verdict.

Cox points to the following comments as evidence of the prosecution's attempts to

denigrate the defense case and defense counsel:

> [L]ook, Mike Dowd [defense counsel] got up here and, you know, he can spin a
> nice tail [*sic*]. . . . But as far as, you know, listening to what Mr. Dowd said, you
> know, I hope you're not buying what he's selling, because if you're doing that,
> then I don't know if you're getting your money[']s worth either just like [Michael]
> Cox was talking about. . . .

T.658-59.

> I resent the fact that Mike Dowd gets up to you and says to you, Antwan Giles,
> one of the combatants, because the guy that ordered people out didn't know his
> name as one. What the defense is trying to do now, and if you notice the whole
> focus of the defense in this case was to put Antwan Giles on trial . . . . [W]e're
> going to go over here and we're going to distract the jury. . . .

T.667.

> If I can figure out what the scope of the defense is, and frankly the defense doesn't
> have to be anything in particular, all it has to be from their perspective is
> something that confuses you. . . .

T.671.

> What I don't want is for you to get confused by things Mike Dowd told you to get
> you off track. . . .

T.684.

In this court's view, a number of these comments were a personal attack on the character

of the defense counsel and wholly inappropriate. While "[t]he prosecutor can properly ask the

jury not to be side-tracked by certain evidence and certain issues to focus on the issues that make

out the prosecution's case," *Garcia v. Greiner*, 2004 WL 943902 (E.D.N.Y. Apr. 28, 2004); *see

also United States v. Resto*, 824 F.2d 210, 212 (2d Cir. 1987) (holding that prosecutor's

characterization of defense tactics as "slick bits," "slyness" and stating that the defense engaged

in "sleight-of-hand" not so egregious as to warrant reversal on direct review of conviction), he

should not resort to engaging in personal attacks on the attorney for the defendant.  Nevertheless,

I am constrained in my view of his comments by Second Circuit precedent, *see Resto*, 824 F.2d

at 212.  While I believe that the prosecutor's comments appear to be more personal and more

serious than those in *Resto*, *id.*, I reluctantly conclude that his comments were "not so egregious

as to warrant reversal on direct review of conviction," *Resto*, *id.*, and thus would not be a basis

for habeas relief.

Cox contends that the following comments served to diminish the prosecution's burden

of proof:

> [T]he defendant has come into court, said I'm not guilty, give me a trial, that's
> what he's entitled to. He had representation. That's what he's entitled to. That's
> all he's entitled to. You're entitled now to make a decision about what you believe
> happened. . . .

T.658. The prosecutor later stated, "There's no trick. He wanted a trial, he got a trial, that's it."

T.692.  Cox has not explained, and it is unclear to the Court, how these remarks would have

diminished the prosecutor's burden of proving Cox's guilt beyond a reasonable doubt. The Court

does find that they were fairly pointless and added nothing to the prosecutor's summation, but

that is not a ground for finding that they amounted to a constitutional violation.

Cox also argues that the prosecutor improperly appealed to the jurors' fears and

sympathies. The prosecutor stated, "Try if you can to put yourself in the position of the people

that found themselves in the back room of that establishment."  T.659. He also commented, "I

was touched by the way that Ashanti [Stancil] said the gun starts, the gunshot started, and I'm on

the dance floor and my sister was there, and the first thing I thought of was where's my sister."

T.661. Finally, the prosecutor said,

> And the terror doesn't stop with the people that were back there as potential victims . . . .
> [The officer] had to go in. To serve and protect. That's what police do. That's his job. . . .
> Talk about terror. Talk about fright. This guy doesn't know if his next breath is going to
> be his last, but in he goes, because he must, that's his job . . . . So imagine Ted Weed's
> terror . . . .

T.662-64. The foregoing three remarks were clearly improper.

After reviewing the transcript in its entirety, the Court agrees with Cox that the

prosecutor's remarks were clearly improper and ill-advised. The Court has no difficulty in

concluding that the prosecutor's statements regarding his opinion about the strength of the case

against petitioner, his attacks on the character of defense counsel, and his comments appealing to

the jurors' sympathies constituted severe misconduct. The issue, however, is whether the

statements effectively denied Cox his fundamental right to a fair trial. Reviewing the challenged

remarks under the three-part test set forth in *Modica*, 663 F.2d at 1181, the Court finds that the

misconduct was severe: Cox's trial unfortunately reveals a pattern of misconduct during

summation by the prosecutor. Regrettably and inexplicably, the trial judge did not take the

opportunity to employ any curative measures and instead implicitly condoned the prosecutor's

impropriety by overruling defense counsel's sole objection and by failing to issue *sua sponte*

curative instructions regarding the offensive comments to which counsel did not object.

Although there were a number of comments playing on the same, improper themes, the

misconduct was confined to several instances during summation; with the exception of the

comments in summation, the trial as a whole was essentially free from improper conduct by

either counsel. Also, the prosecutor's comments, though condemnable "did not manipulate or

misstate the evidence, nor did [they] implicate other specific rights of the accused such as the right to counsel or the right to remain silent." *Darden v. Wainwright*, 477 U.S. 168, 182 (1986).

Turning to the second *Modica* factor, the court issued no curative objections, but trial counsel only objected to one remark. Where a defendant has failed to object to the prosecution's summation during trial, a new trial is warranted only where there was "flagrant abuse." *United States v. Zichettello*, 208 F.3d 72, 103 (2d Cir. 2000) (citation omitted). I reluctantly conclude that the prosecutor's comments, although bordering on it, did not rise to the level of "flagrant abuse" warranting a grant of Cox's petition.

Turning to the third *Modica* factor, upon a review of the entire trial transcript, the Court is convinced of the certainty of Cox's conviction, even absent the improper prosecutorial remarks and the failure of the trial court to intercede. Considering the strength of the prosecution's case against petitioner and the certainty of the jury returning a guilty verdict, the Court is compelled to find that the improper comments did not so infect the trial with unfairness as to make the proceeding a denial of due process. Indeed, the evidence against Cox was overwhelming.  No less than eight witnesses saw him with a gun–with seven of them witnessing him shooting at the victims.  One of those witnesses saw him take the gun from the trunk of a car and enter the building.  Thereafter, she heard shots being fired. Several of those witnessing the firing of the gun testified that Cox was unimpeded while he was shooting.  Ballistic tests implicated the weapon.  The jury found that the weapon used in the shooting was the one Cox was firing into the crowd.  Therefore, habeas relief will not issue on this claim.

Nevertheless, the Court must express its dismay and frustration with prosecutors such as this one who rely on cheap shots and gimmicks rather than the strength of their ability to argue

persuasively on the facts and the law. As the Second Circuit noted in *Modica*, "'The appellate tribunals have found to their dismay that they cannot uphold a conviction and yet successfully condemn the method by which it was secured. Carefully written opinions condemning the indiscretion and misconduct have not been successful to curb improprieties. The very act of upholding the conviction has given prosecutors approval, and the "judicial slap on the wrist" has not deterred the prosecutor from his unethical and improper tactics.'" *Modica*, 663 F.2d at 1183 (quoting Note, Prosecutor Indiscretion: A Result of Political Influence, 34 Ind.L.J. 477, 487 (1959)). Invoking the remedy of a new trial is not appropriate where, as here, "the misconduct has not substantially prejudiced [the] defendant's trial." *Id.* The Second Circuit has observed that "[r]eversal is an ill-suited remedy for prosecutorial misconduct; it does not affect the prosecutor directly, but rather imposes upon society the cost of retrying an individual who was fairly convicted." *Id.* at 1184. Importantly, this type of conduct is completely unnecessary.

Furthermore, because the Court is only sitting in collateral review of this matter, it does not have the jurisdiction to judicially sanction a prosecutor or issue contempt penalties against him. Consequently, the Court admonishes the prosecutor to carefully review New York state's evidentiary law, the Federal Rules of Evidence, the ABA Model Code of Professional Responsibility, the ABA Model Rules of Professional Conduct, and the ABA Standards for Criminal Justice so that he may familiarize himself with the proper manner in which to conduct himself when prosecuting a case on behalf of the People of the State of New York. It is the duty of the prosecution to do justice, not obtain convictions.[6] It demeans justice when participants to

---

[6]      "The [prosecutor] is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. . . . He may prosecute with earnestness and vigor -- indeed, he should do so. But while he may strike hard blows, he is not at

resort to questionable and clearly improper conduct, whether intentionally or from ignorance. Prosecutors should resist temptation and refuse to pick up the figurative "brass knuckles" even if provoked, and do the "right thing" instead of the popular thing. A prosecutor's responsibilities are great. Society depends on their ethics and sense of fair play in convicting wrongdoers.

## 2.      Improper cross-examination by the prosecutor

Cox contends that the prosecutor engaged in prejudicial cross-examination of defense witness Michael Cox by questioning him about his unemployment and welfare status, living arrangements, drug addiction, and the fact that he was arrested on a criminal charge when he appeared in court to testify at petitioner's trial. Defense counsel only objected to one question, which concerned the name and employment status of the person with whom Michael Cox was living. The Court notes that trial counsel "opened the door" to cross-examination on these issues by questioning Michael Cox about them on direct examination. *See* T.599-600. Even if the prosecutor dwelled too long on these areas, petitioner was not prejudiced by the error, given the overwhelming evidence of his guilt. Habeas relief therefore is unwarranted.

## 3.      Failure to disclose *Brady* material

As ground four of his Amended Petition, Cox asserts that certain physical evidence–namely, a bullet–was unlawfully suppressed by the police because it "did not coincide with the theory of the prosecutor," and that it "mysteriously vanished after being tested." Amend. Pet. at 8, ¶22D (Docket #21). In his Traverse to respondent's Answer to the Amended Petition, Cox further argues that this *Brady* issue relates to several projectiles extracted from victim

---

liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." *Berger v. United States*, 295 U.S. 78, 88 (1935).

Beverly King, which allegedly were proven to have been fired from a gun other than the one he purportedly used, and then "maliciously suppressed" by the prosecution. Trav. ¶2 (Docket #26). However, in his earlier pleadings, the *Brady* material to which Cox apparently was referring was the bullet that hit Latosha Bryant. He appeared to arguing either that Bryant lied when she testified that a bullet was removed from her leg and that the prosecutor knowingly allowed Bryant to present perjured testimony, or that a bullet was removed from Bryant, was tested, and was determined to have been fired from a different gun. *See* Pet. at 8 (Docket #1).  Construing Cox's pleadings liberally, the Court will treat both the "King bullet" and the "Bryant bullet" as the allegedly withheld exculpatory material for purposes of the *Brady* analysis.

> a.      **The Bryant bullet**

While describing her injuries and the surgery performed to repair the shattered bones in her leg, Bryant pointed out the various scars remaining from the bullet-entry wound; the placement of the metal rod and screws; and "where they took the bullet out[.]" T.333-35. On cross-examination, Bryant was asked whether the bullet exited her body when she was shot or whether the doctors removed it surgically. T.356. Bryant replied that she thought that the doctors had to remove it. *Id.* And, Bryant's medical records admitted at trial do refer to a procedure to remove a bullet.[7]  Defense counsel did not cross-examine the witness who testified concerning the substance of Bryant's medical records. Based on this testimony, Cox believes that there is a "missing" bullet that was removed from Bryant, was tested, and then was deliberately "lost" by the prosecution.

---

[7]      Bryant's hospital report states in relevant part that "[t]he bullet was extracted" and the "wound was then tacked open." T.516.

In his various F.O.I.L. requests, Article 78 proceedings, and C.P.L. § 440 motions filed in state court, Cox has repeatedly attempted to obtain copies of the forensics report testing this "missing" bullet. The district attorney's office has denied that any such report exists, however, and Cox has never received the alleged report in response to his document requests. Thus, the sole basis for Cox's contention about the allegedly missing bullet is Bryant's testimony and statement in her medical records that a bullet was removed from her leg. In the absence of any credible proof that this forensics report actually exists, let alone whether it would qualify as *Brady* material, the Court cannot find that there was a withholding of potentially exculpatory or impeachment material by the prosecution. *See Strickler v. Greene*, 527 U.S. 263, 281-82 (1999) ("There are three components of a true *Brady* violation: (1) The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) that evidence must have been suppressed by the State, either willfully or inadvertently; and (3) prejudice must have ensued.").

**b.     The King bullet**

In his Traverse, Cox asserts that several projectiles were removed from Beverly King and that one of them was proven to have been fired from a gun other than the gun he allegedly used to commit the crime, and that this information was suppressed by the prosecution. *See* Trav. ¶2 (Docket #26). However, Cox was *not charged* with the shooting of King.[8] Thus, not surprisingly, King did not testify at trial and there was no testimony at trial regarding the forensics analysis of

---

[8]     The indictment alleged that Cox intentionally assaulted Antwan Giles (count one), recklessly assaulted Aisha Stancil (count two), recklessly assaulted Latosha Bryant (count three), recklessly assaulted Erica Rivers (count four), and recklessly assaulted Stephanie Flynn (count five). The first four counts were charges of first degree assault; the fifth count charged second degree assault.

any bullets removed from King. Nevertheless, Cox argues that this "inconsistent" projectile constitutes *Brady* material because it shows that several guns caused injuries that night and raises the possibility that a gun other than his may have caused injury to Giles, Stancil, and Bryant, since no bullets were recovered from these victims.

In any event, the documents submitted by Cox in support of this claim do not bear out his argument. The forensics report attached to correspondence received by the Court from petitioner on December 30, 2004, indicates that two parts of a one bullet (a bullet jacket and lead bullet core) were recovered from King. These items were "badly damaged." Nevertheless, the ballistics expert was able to establish that the bullet jacket recovered from King was fired by the same Hi-Point 9-mm pistol that fired the bullets that struck Flynn and Rivers. Thus, this evidence is inculpatory, rather than exculpatory. Moreover, Cox has not shown how the evidence would have been of impeachment value to him. Thus, it cannot be considered *Brady* material. *Strickler*, 527 U.S. at 281-82.

## 4.     Presentation of perjured testimony

As ground eight, Cox contends that the prosecution "submitted false evidence by permitting Ms. Bryant to testify to the removal of [a] projectile where prosecutor knew that this evidence was false." *Id.* at 9 (Docket #21). This claim has no factual basis. At trial, the prosecution introduced Bryant's medical records which clearly indicate that she underwent a surgical procedure to remove the bullet lodged in her leg. Unless Cox is claiming that Bryant's medical records were falsified, which he has not claimed, the Court can discern no basis on which he could plausibly argue that Bryant was not telling the truth when she testified that the doctors had to remove a bullet from her leg. Moreover, this claim does not even make sense in

light of Cox's *Brady* claim that the prosecution unlawfully suppressed a purported forensics report regarding the bullet extracted from Bryant's leg. In short, this claim is frivolous and cannot provide a basis for habeas relief.

## 5.    Harsh and excessive sentence; vindictive sentence

A petitioner's challenge to the term of his sentence generally does not present a cognizable constitutional issue if the sentence falls within the applicable statutory range. *White v. Keane*, 969 F.2d 1381, 1383 (2d Cir. 1992). Thus, Cox's assertion that the sentencing judge abused his discretion in sentencing him is not subject to habeas review since the sentence, as modified, fell within the limits set forth by New York's Penal Law. *See Fielding v. LeFevre*, 548 F.2d 1102, 1109 (2d Cir. 1977); *Townsend v. Burke*, 334 U.S. 736, 741 (1948) ("The [petitioner's] sentence being within the limits set by the statute, its severity would not be grounds for relief here even on direct review of the conviction, much less on review of the state court's denial of habeas corpus.").

The crux of petitioner's contention regarding his sentence is rather that the trial court sentenced him vindictively for exercising his right to a jury trial. *See* Amend. Pet. at 8, ¶22C (Docket #21). On March 11, 1997, Cox appeared in court, prepared to plead guilty to two class C violent felonies (attempted assault in the first degree of Giles and Bryant) in satisfaction of the indictment charging him with seven violent felonies of degrees varying from class B to class D. With respect to sentencing, it was understood that the court could impose two consecutive sentences of seven and one-half to fifteen years on each of the two crimes two which Cox had agreed to plead guilty.

During the plea allocution, the court determined that Cox's factual admissions did not satisfy the elements of the crimes to which he was attempting to plead. Specifically, Cox had to admit that he intended, and at least attempted, to shoot both Giles and Bryant. However, Cox insisted that he "wasn't trying to shoot nobody or nothing" and that he "didn't do nothing wrong" and that he was only "shooting into the floor" to "move [Giles] back." H.10-15.[9]  Based on Cox's failure to admit culpability, let alone the requisite intent, the trial court declined to accept the plea.

At sentencing, the court, without comment on either Cox's statement or the respective arguments of counsel, imposed sentences of seventeen and one-half to fifteen years for the three assault in the first degree convictions, sentences of three and one-half to seven years for the two assault in the second degree convictions, sentences of twelve and one-half to twenty-five years for the two firearm use in the first degree convictions, and a sentence of seven and one-half to fifteen years for the criminal possession of a weapon in the second degree conviction. All sentences were set to run consecutively to each other. As noted above, the Appellate Division modified his sentence so that the terms of imprisonment for the weapons use and possession convictions would run concurrently with the sentences for the related assault convictions.

With respect to his vindictive sentencing claim, I note that the difference between the offered sentence and the imposed sentence does not make out a claim of actual vindictiveness because the judge never stated or implied that the sentence was based on the fact that Cox took his case to trial.  *See Naranjo v. Filion*, 2003 WL 1900867, at *10 (S.D.N.Y. Apr. 16, 2003) (denying habeas claim based on disparity between pre-trial offer of five to ten years and ultimate

---

[9] Citations to "H.__" refer to the transcript of the plea hearing.

sentence of twenty-five to fifty years; such difference did not establish claim of actual

vindictiveness because judge never suggested that sentence based on refusal of plea offer). The

mere fact that the trial court, following conviction, imposed a high sentence does not, in and of

itself, establish "actual vindictiveness." *See id.* (citing, *inter alia*, *Corbitt v. New Jersey*, 439 U.S.

212, 219, 223 (1978) ("We have squarely held that a State may encourage a guilty plea by

offering substantial benefits in return for the plea. . . . We discern no element of retaliation or

vindictiveness against [appellant] for going to trial. There is no suggestion that he was subjected

to unwarranted charges. Nor does this record indicate that he was being punished for exercising a

constitutional right. . . . There is no doubt that those homicide defendants who are willing to

plead *non vult* may be treated more leniently than those who go to trial, but withholding the

possibility of leniency from the latter cannot be equated with impermissible punishment as long

as our cases sustaining plea bargaining remain undisturbed."); *Chaffin v. Stynchcombe*, 412 U.S.

17, 31 (1973); *United States ex rel. Williams v. McMann*, 436 F.2d 103, 106-07 (2d Cir. 1970),

*cert. denied*, 402 U.S. 914 (1971); *Bailey v. Artuz*, 1995 WL 684057, at *2 (N.D.N.Y. Nov. 15,

1995) ("[A] sentencing judge does not show vindictiveness . . . by sentencing a defendant who,

after withdrawing his plea of guilty to a lesser offense carrying a lower penalty, has then been

convicted of a more serious offense to the higher penalty authorized . . . [Petitioner] has offered

no evidence of vindictive sentencing beyond the fact of the plea bargain offered to him and the

actual sentence he received. . . . Therefore, [petitioner] has not made out a claim of

constitutionally impermissible vindictive sentencing.")).

Cox has offered no proof in support of his claim of vindictiveness, other than the difference between the pre-plea sentence and the imposed sentence. This is plainly insufficient. *See*, *e.g.*, *Naranjo*, 2003 WL 1900867, at *10. Habeas relief will not issue on this claim.

**6.     Ineffective assistance of trial counsel**

      **a.     Legal standard**

In order to prevail on a claim of ineffective assistance of counsel within the framework established by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984), a habeas petitioner must satisfy a two-part test. First, a petitioner must demonstrate that counsel's performance was so deficient that counsel was not functioning as "counsel" within the meaning of the Sixth Amendment to the Constitution. *Id.* at 688. In other words, a petitioner must show that his attorney's performance "fell below an objective standard of reasonableness." *Id.* Second, a petitioner must show that counsel's deficient performance prejudiced him. *Id.* at 694. To establish the "prejudice" prong of the *Strickland* test, a petitioner must show that a "reasonable probability" exists that, but for counsel's error, the outcome of the trial would have been different. *Id.* at 694.  The issue of prejudice need not be addressed, however, if a petitioner is unable to demonstrate first that his counsel's performance was inadequate. "[T]here is no reason for a court deciding an ineffective assistance claim to . . . address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697.

      **b.     Alleged grounds of attorney ineffectiveness**

            **i.     Failure to request suppression hearing**

In his amended petition, Cox contends that trial counsel was deficient in failing to request a suppression hearing "for the firearm" which "was recovered from another defendant who had

nothing to do with this case, and pleaded guilty to possessing this gun[.]" Since Cox does not

provide the legal and factual bases on which trial counsel should have argued for the preclusion

of the firearm, the Court cannot assess whether the motion would have been likely to succeed.

Therefore, this claim is too vague to state a basis for habeas relief. Even if the evidence of the

gun had been suppressed, based on the totality of the evidence against Cox, it would not have

affected the outcome of the trial, and Cox cannot demonstrate that he was prejudiced.

### ii.      Failure to request jury instruction

Cox faults trial counsel for failing "to request the court give an expert witness charge in

regards to Mark Shaw[,] forensic analyst." Amend. Pet. at 9 (Docket #21). Cox does not explain

whether it was even appropriate for the trial court to issue an "expert witness" charge, let alone

how the outcome of his trial would have been different had such a charge been given. Cox's

allegations are too vague to state a cognizable claim for relief.

### 7.      Ineffective assistance of appellate counsel

#### a.      Legal standard

The *Strickland* two-pronged standard applies equally to claims of ineffective assistance

of appellate counsel. *E.g.*, *Claudio v. Scully*, 982 F.2d 798, 803 (2d Cir. 1992), *cert. denied*, 508

U.S. 912 (1993). In attempting to establish that appellate counsel's failure to raise a claim on

appeal constitutes deficient performance, it is insufficient for the petitioner to show "merely that

counsel omitted a nonfrivolous argument, for counsel does not have a duty to advance every

nonfrivolous argument that could be made." *Id.* (citing *Jones v. Barnes*, 463 U.S. 745, 754, 103

S. Ct. 3308, 3314, 77 L. Ed.2d 987 (1983)). Whether the neglected appellate issue is based on

federal or state law, the burden rests on petitioner to show "that counsel omitted significant and

obvious issues while pursuing issues that were clearly and significantly weaker." *Id.* In assessing appellate counsel's performance, I must judge the conduct at issue on the basis of the facts of the particular case, viewed as of the time that counsel was preparing the appeal. *Strickland*, 466 U.S. at 690. Furthermore, I must make every attempt to eliminate the distorting effects of hindsight from my evaluation of his performance. *See Lockhart v. Fretwell*, 506 U.S. 364, 113 S.Ct. 838, 844, 122 L.Ed.2d 180 (1993); *accord Mayo*, 13 F.3d at 533.

> **b.      Alleged grounds of ineffectiveness**

Cox contends that appellate counsel was ineffective in failing to argue on appeal that trial counsel was ineffective based on the alleged omissions detailed above. As discussed previously, there is no basis for finding that trial counsel was deficient, let alone that Cox was prejudiced by trial counsel's alleged errors. Thus, since appellate counsel had no colorable argument that trial counsel was ineffective, he acted quite reasonably in choosing not to raise an ineffectiveness claim on direct appeal. Furthermore, since any ineffectiveness claim premised on the alleged shortcomings of trial counsel would not have succeeded on direct appeal, Cox was not prejudiced by appellate counsel's failure to raise such an argument. This claim accordingly cannot serve as a basis for habeas relief.

## 8.      Insufficiency of the evidence

Defendants challenging the sufficiency of the evidence to support their convictions face a "very heavy burden." *Knapp v. Leonardo*, 46 F.3d 170, 178 (2d Cir.1995). When reviewing a claim of insufficient evidence, courts must consider "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)

(emphasis in original). The reviewing court must defer to the jury's "assessments of the weight of the evidence and the credibility of witnesses," *Maldonado v. Scully*, 86 F.3d 32, 35 (2d Cir.1996), and may only grant habeas relief if the petitioner has shown that, "upon the record evidence adduced at the trial *no* rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson*, 443 U.S. at 324 (emphasis added).

Cox contends that the prosecution failed to establish his guilt beyond a reasonable doubt "due to the existence of a victim being shot with a gun other than Peoples #2." Amend. Pet. at 9 (Docket #21). Presumably, Cox is arguing that Bryant was the victim who allegedly was not shot by the assault weapon introduced at trial. This contention is premised solely on Cox's belief that there is a missing forensics report somewhere concluding that the bullet removed from Bryant's leg did not come from People's Exhibit #2, the Remington Hi-Point 9-mm handgun recovered in the trunk of a car belonging to one of Cox's uncles. However, there is no such report in existence. For some reason, the bullet recovered from Bryant's leg was not turned in to Mark Shaw ("Shaw"), the ballistics expert, for testing. Shaw testified that he only received bullets recovered from victims Flynn and Rivers.

In any event, Cox's leap of logic is unfounded–simply because a bullet was found in Bryant's leg and not tested does not mean that the bullet necessarily was fired from a different gun than the one used in the shooting spree. Cox has not provided the Court with any credible evidence to support his contention–only speculation and conjecture, which cannot be factored into the equation when reviewing a claim of insufficient evidence. Given the proof actually presented at trial, viewed in the light most favorable to the prosecution, a rational jury easily could have found petitioner guilty beyond a reasonable doubt of shooting Bryant. Bryant testified

that there was only one individual shooting in the crowd on the dancefloor at the club–Cox. Her testimony on this point was corroborated by numerous other witnesses. Regardless, Bryant's testimony alone would have been sufficient, even without the corroborating witnesses, for "'the testimony of a single, uncorroborated eyewitness is generally sufficient to support a conviction[.]'" *United States v. Frampton*, 382 F.3d 213, 222 (2d Cir. 2004) (quoting *United States v. Danzey*, 594 F.2d 905, 916 (2d Cir. 1979) and citing *Weiler v. United States*, 323 U.S. 606, 608, 65 S.Ct. 548, 89 L.Ed. 495 (1945); 7 Wigmore, Evidence § 2034 (Chadbourn rev. 1978) ("In general, the testimony of a single witness, no matter what the issue or who the person, may legally suffice as evidence upon which the jury may found a verdict.")). For these reasons, petitioner's claim of insufficient evidence does not warrant habeas relief.

## CONCLUSION

For the reasons stated above, petitioner LaVon Cox's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is denied, and the petition is dismissed.  Because petitioner has failed to make a substantial showing of a denial of a constitutional right, I decline to issue a certificate of appealability. *See* 28 U.S.C. § 2253.

**IT IS SO ORDERED**

/s/ *Victor E. Bianchini*

_____
VICTOR E. BIANCHINI
United States Magistrate Judge

DATED:        March 20, 2006
              Buffalo, New York.